# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 4:22-CR-162 |
| | § | Judge Mazzant |
| GINA ELLINGSEN (6) | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Gina Ellingsen's Motion for Judgment of Acquittal (Dkt. #374). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds that the Motion should be **GRANTED**.

## BACKGROUND

On July 14, 2022, a Grand Jury indicted Gina Ellingsen with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 on July 14, 2022 (Dkt. #1). The Grand Jury returned a First Superseding Indictment on March 5, 2025, which cleaned up the charges against Ellingsen (Dkt. #274). The First Superseding Indictment alleges that Ellingsen participated in a scheme to defraud the customers of Electronic Transactions Systems Corporation ("ETS"), her employer (Dkt. #274). According to the First Superseding Indictment, ETS was a credit and debit card processing company, which exploited its position as a middleman in communicating payment card transaction information to charge its customers undisclosed markups (Dkt. #274 at ¶ 4).[1] On

---

[1] A payment card transaction is a three-party transaction. First, a merchant will engage a card process company (like ETS) to provide the hardware and software to read credit and debit cards. When a customer pays the merchant using the card, the card processing company will handle the communication of the transaction to the bank where the client has funds. In exchange for the necessary equipment and communications, the card processing company will charge a set amount of fees for its own services. Additionally, the card processing company will charge a fee associated with the card brand used, which it then passes on to the card brand. Generally, the process looks as follows: Merchant (charges a customer's credit or debit card) —> Card Processor (communicates the transaction and charges fees for itself and the card brand) —> Card Brand (receives a set fee passed on by the card processor).

all payment card transactions, ETS charged a pass-through fee set by the card brand associations (e.g., Visa, Mastercard, American Express, etc.) as well as a small percentage fee that ETS would retain (Dkt. #274 at ¶¶ 6–7). ETS also charged an additional .3% markup for all debit card transactions, which it embedded into the interchange fee section—the fees ETS told its customers that it solely passes on to the card brand associations (*See* Dkt. #274 at ¶¶ 8–10).

The Grand Jury indicted six defendants in the First Superseding Indictment—Edward Vaughan (ETS's president), Hadi Akkad (ETS's Executive Vice President), Jill Hall Mandichak (ETS's National Sales Manager), Sean Lynch (ETS's Sales Manager), Katherine Nguyen (ETS's Director of National Accounts), and Ellingsen (ETS's Payments Industry Expert) (Dkt. #274 at ¶ 3). Mandichak, Lynch, and Nguyen pleaded guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 on December 15, 2022 (*See* Dkt. #123, Dkt. #128, Dkt. #133). Vaughan, Akkad, and Ellingsen proceeded to a jury trial, which began on April 1, 2025 (*See* Dkt. #351). The evidence adduced at trial primarily concerned Vaughan and Akkad. However, the Government offered testimony against Ellingsen from her former manager at Total System Services, Inc. ("TSYS"), employees at ETS (including co-defendants Lynch and Mandichak), and Eric Jiles (the Director of Finance for the City of Parkersburg) West Virginia—one of ETS's former clients. Additionally, the Government offered documentary evidence against Ellingsen, including: (1) computer log-in data that showed when she updated the billing tables, (2) an income chart laying out how Ellingsen's salary increased when she joined ETS, (3) external emails sent between Ellingsen and clients, (4) internal ETS emails discussing the nature of the fees and billing practices, and (5) recorded phone calls between Jiles and Ellingsen, where she explains ETS's fee structure and billing practices. *See* GX 122C; 130A–131B; 200; 203; 208; 210–13; 232.

On March 11, 2025, the Government rested its case-in-chief. All Defendants moved for a Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29 (*See* Dkt. #373; Dkt. #374; Dkt. #387). The Court denied Vaughan and Akkad's Motions the same day. However, the Court entertained argument regarding Ellingsen's Motion (Dkt. #387; Dkt. #388). Subsequently, the Government filed a written Response to Ellingsen's Motion on March 12, 2025 (Dkt. #390). Ellingsen filed her Reply on March 13, 2025 (Dkt. #393). The Government filed a Sur-Reply the same day (Dkt. #394).

## LEGAL STANDARD

A defendant is presumed innocent until proven guilty. *Deck v. Missouri*, 544 U.S. 622, 630 (2005) (citing *Coffin v. United States*, 156 U.S. 432, 453 (1895)). A court should grant a motion for a judgment of acquittal if the government fails to present sufficient evidence for a reasonable jury to find that each essential element of the offense was established beyond a reasonable doubt. FED. R. CRIM. P. 29(a); *United States v. Ortego Reyna*, 148 F.3d 540, 543 (5th Cir. 1998). In deciding such a motion, the Court must consider the evidence in the light most favorable to the government. *United States v. Santillana*, 604 F.3d 192, 195 (5th Cir. 2010). Further, the Court must draw all reasonable inferences and render all credibility determinations in the government's favor. *Id.* Thus, the questions is whether, when viewing the evidence in the light most favorable to the government, "a reasonable and fair-minded jury could find the admissible evidence sufficient to support the jury's verdict of guilty." *United States v. Strong*, 371 F.3d 225, 227 (5th Cir. 2004) (internal quotation omitted); *United States v. Herberman*, 583 F.2d 222, 231 (5th Cir. 1978). If the evidence viewed in the light most favorable to the government gives equal or nearly equal

circumstantial support to a theory of guilt and a theory of innocence, the court should acquit. *See United States v. Schuchmann*, 84 F.3d 752, 753 (5th Cir. 1996).

In order to support a conviction for conspiracy to commit wire fraud under 18 U.S.C. § 1349, the Government must prove beyond a reasonable doubt that: (1) two or more persons made an agreement to commit wire fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement with the intent to further the unlawful purpose. *See United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018). The Government may establish any element of the conspiracy through circumstantial evidence. *See United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014). An agreement need not be spoken or formal. *Ganji*, 880 F.3d at 767. Nonetheless, an agreement is a necessary element of conspiracy. *Id.* Proof of an agreement to enter a conspiracy is not to be lightly inferred. *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971). The Government must prove its existence beyond a reasonable doubt. *Ganji*, 880 F.3d at 767.

Similar conduct among various people and the fact that they are associated is insufficient to prove an agreement. *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978). Each party to a conspiracy must have intentionally entered into the agreement. *United States v. Alvarez*, 610 F.2d 1250, 1255 (5th Cir. 1980). Similarly, each must have held a common intent to commit an unlawful act. *Id.* The Government may establish that an agreement by showing that the conspirators only acted in a specific way because of the conspiracy, which is known as a concert of action theory. *See Ganji*, 880 F.3d at 768 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 754 (1984)). Under a concerted action theory of agreement, the defendant's actions and their surrounding circumstances must be incriminating enough to warrant a finding that the Government proved the

4

existence of an agreement beyond a reasonable doubt. *Id.* Concerted action between conspirators illustrates that an agreement must exist because the individuals would not have otherwise acted in that particular manner. *See United States v. Cessa*, 785 F.3d 165, 179–80 (5th Cir. 2015); *United States v. Arredondo-Morales*, 624 F.2d 681, 684 (5th Cir. 1977). In other words, when the Government proves an agreement by concerted action, it must present evidence of the *co-conspirator's individual actions* that, taken together, evidence an agreement to commit an unlawful objective beyond a reasonable doubt. *See Ganji*, 880 F.2d 768–69 (emphasis added).

## ANALYSIS

The current issue before the Court is whether the Government presented sufficient evidence to establish that: (1) Ellingsen had knowledge that the merchant clients were not told about how ETS fraudulently concealed its debit billing practices, and (2) Ellingsen joined the conspiracy with an intent to further conceal the undisclosed debit card billing practices. In its efforts to prove Ellingsen's guilt, the Government introduced a variety of evidence. At trial and in its Motions, the Government focused on the following as the most inculpatory:

1. The billing entry tables ("BETs") showing that Ellingsen was the one who input the debt fees in the Interchange section. GX 122C;

2. Recorded phone calls with Eric Jiles, an ETS customer, in which Ellingsen explains ETS's billing practices. GX 130A; GX 130B; GX 131A; GX 131B;

3. An internal ETS email marked "Confidential: Debit Markup" between Ellingsen and Vaughan, where Ellingsen explains the debit markup and billing process. GX 208;

4. Internal emails between Ellingsen and Nguyen discussing the markup and billing issues. GX 211; GX 212; GX 213;

5. Documents that show Ellingsen received a pay increase when she left TSYS for ETS, and counter evidence showing that the increase was market rate for former TSYS employees. GX 232; DX 635;

5

   6. Trial Testimony from Jon Dotson (an ETS employee), Laurie Sheehan (a TSYS employee), and Eric Jiles (the Director of Finance for an ETS customer) about Ellingsen's role as a relationship manager, knowledge of TSYS, and interactions with Vaughan.

Notably, the Government offered no direct evidence that Ellingsen knew of the fraudulent billing or that she acted outside the bounds of her employment to join the illegal conspiracy. The two co-defendants who testified did not know Ellingsen, nor what she did for ETS. Nguyen, the co-defendant who interacted with Ellingsen the most, did not testify. Thus, the Government evidence against Ellingsen is circumstantial and based on a concert of action theory to establish Ellingsen's knowledge of the illegal nature of the conspiracy, her agreement to join the conspiracy, and her intent to further the conspiracy's purposes. The Court will evaluate whether a reasonable jury could infer the existence of a conspiratorial agreement beyond a reasonable doubt based on all of the evidence the Government offered against her, paying special attention to the pieces of evidence the Government heavily relied on in trial and in its Motions.

 First, as an employee at ETS, Ellingsen was the one who changed the BETs to add the .3% markup. GX 122C. However, changing the tables does not establish knowledge of the conspiracy nor an agreement to join in, as inputting the numbers does not, in and of itself, establish knowledge of the conspiracy's illicit nature or an agreement to join in the conspiracy. Inputting the numbers into the BETs, on its own, does not allow a reasonable jury to infer Ellingsen had some conspiratorial intent at the time she performed those actions. Evidence at trial established inputting the umbers was one of Ellingsen's duties, which she performed at the direction of Vaughan and Akkad (who made the decisions on what ETS charged its clients). Without more context surrounding the decision or direction to input those numbers, the BETs only show that Ellingsen input the numbers.

Second, the internal emails between Ellingsen and Vaughan likewise do not establish an intent to join the conspiracy. GX 200; GX 208. Instead, the only inference a reasonable jury could draw is that Ellingsen knew how the payment system worked and explained it to Vaughan. The emails do not establish that Ellingsen attempted to assist the conspiracy with knowledge of its illicit nature because Ellingsen only provided updates and work progress in those emails, without revealing her intent or knowledge about the alleged illicit nature ETS's billing practices. Thus, the only conclusion a reasonable jury could draw is that she was an employee keeping her boss appraised of what she was doing to ensure she was following orders correctly.

The emails with Nguyen and Parkersburg also do not leave room for a reasonable juror to infer that Ellingsen's conduct demonstrates her knowledge of the conspiracy and an agreement to join it. GX 210–211. These emails show Ellingsen performed her job as the person who could explain how ETS's billing worked when a client called with concerns. GX 210 is an internal ETS email between Ellingsen and Nguyen, where Ellingsen explains that the .3% fee in relation to inquires made by the City of Parkersburg. GX 211 is an external email between Ellingsen and Jiles, where she adds a brief explanation to how ETS bills its customers and offers to call him to further explain if he still had questions. When viewed in the light most favorable to the Government, no reasonable juror could infer Ellingsen's intent to conceal the markup from customers, much less her agreement to do so with other employees, as she explained how the billing worked to clients.

GX 212 consists of an internal email exchange between Ellingsen and Nguyen. The short email thread revolves around scheduling a time when Ellingsen and Nguyen would be available to meet with Jiles. However, due to the acquisition of ETS, Nguyen was no longer in a position to meet with clients. Even assuming she was actively avoiding Jiles so that she would not have to

discuss ETS's billing procedures, Ellingsen was still attempting to meet with Jiles and include Nguyen as Jiles requested. GX 212. While Nguyen offers to buy dinner and drinks for Ellingsen, nothing in the email could lead a reasonable juror to conclude that Ellingsen had agreed to mislead Jiles as to the nature of ETS's billing procedures. At most, the email shows that Ellingsen was actively trying to meet with Jiles, and that Nguyen did not want to meet with Jiles. Nothing in the email goes to establish *Ellingsen's* agreement or intent to be a member of the alleged conspiracy.

Before turning to the final email, it is necessary to evaluate the Jiles phone calls. GX 130A–131B. The Government offered the phone calls between Jiles and Ellingsen to show that Ellingsen was aware of the conspiracy and attempted to mislead Jiles (Dkt. #390 at pp. 18–20; Dkt. #394). Ellingsen contends that examining the entirety of the phone calls show that she was truthful in describing ETS's billing practices—something inconsistent with the conspiracy and consistent with being an employee trying to assist a customer (Dkt. #374 at pp. 11–13; Dkt. #392 at pp. 12–15). The Government argues that Ellingsen lied and misled Jiles until she had no choice but to come clean (Dkt. #390 at pp. 18–20; Dkt. #394). However, the Government's interpretation of the phone calls overlooks the very fact that, by the end of both phone calls, Ellingsen had explained how ETS bills clients, including that ETS placed some of its own fees in the Interchange. GX 130A–131B.

In the first phone call with Jiles on December 17, 2018, Jiles calls with questions and concerns about the amount of money the City of Parkersburg is being charged by ETS. GX 130A; 130B. In response to his concerns, Ellingsen explains ETS's billing process that clients are charged a card brand fee in the plan summary section and the .3% debit markup in the interchange section. GX 130B at p. 8–13. Throughout the conversation, Ellingsen attempts to perform her customer service duties as an employee. At times, she states that she will have to talk to other co-workers to

accomplish Jiles' requests. GX 130B at pp. 22–23. Further, the first phone call establishes the earliest point in Ellingsen's employment with ETS where a reasonable jury could infer that she had knowledge that the contracts with clients did not disclose that ETS charged both the card brand fee and an additional markup on debit card transactions. After Jiles explained the City's confusion over how it was billed and that contract did not state the City would be charged both fees, Ellingsen responds by saying "[t]hat's a good point." GX 130B at p. 19 lines 6–14. The statement is significant because it establishes the first time during Ellingsen's employment where a reasonable jury could infer that she was aware that ETS's billing practices had not been disclosed to ETS clients in the contracts. But this new knowledge cannot prove beyond a reasonable doubt that Ellingsen knew the billing process was fraudulent or that she was joining a conspiracy. This is because the knowledge that ETS had not clearly disclosed its billing process in the contract does not create a knowledge that the nondisclosure was due to an intent to defraud. Further, it does not show that she agreed to help conceal the billing practices of ETS. Instead, the first phone call shows when Ellingsen was actually made aware that the contracts did not clearly disclose both fees were charged on debit transactions.

Ellingsen's knowledge that ETS had not fully disclosed its billing methods is further shown in the second phone call with Jiles on January 3, 2019. GX 131A; 131B. There, Jiles again expresses confusion and frustration at being charged both fees when ETS sales representatives said all of the interchange fees were passed on to the card brand companies. Ellingsen responds that the contract "and a conversation with your salesperson, they should've explained how this works." GX 131B at p. 20 lines 14–22. This follow-up shows that Ellingsen was made fully aware of the problem during the phone call. No evidence dated before the phone call shows that Ellingsen was told that

9

the sales personnel had not explained the agreements and billing practices to ETS's clients. *See* GX 131B at p. 20 lines 14–22. However, she became aware that the conversations between the salespeople and clients did not happen. Instead of redirecting Jiles, she again explained the pricing and ETS's billing practices. She even stated she would attempt to get Jiles an updated contract that clearly states the debit markup and card brand fees would both be charged. *See* GX 131A; 131B. In both phone calls, Ellingsen endeavored to fully explain the pricing model and did not attempt to conceal or misdirect Jiles because she continually gave consistent answers on how ETS's billing practices worked. *See* GX 130A–131B. If anything, the phone calls with Jiles exculpate Ellingsen. If she were truly a member of the conspiracy, she would not have explained the billing practices of ETS. But she did. Thus, no reasonable juror could infer that Ellingsen had agreed to join a conspiracy to conceal ETS's billing practices based on the phone calls with Jiles where she explained the very thing she is alleged to have conspired to conceal.

The most compelling evidence the Government offered to show Ellingsen was part of the conspiracy is an email Ellingsen sent a few weeks after the second phone call with Jiles. GX 213. In that email, Ellingsen states that providing the card brand interchange fee rates to customers is a "great way to stay transparent." Nguyen agreed and stated that "[i]t is until that extra 30 bps hits em lol." Ellingsen responds, stating "[l]ol . . . true but I'm always here to help out with that one [winking-face emoji]." On its face, a jury could draw the inference that (1) Ellingsen knew about the fraudulent billing practice; and (2) agreed with one of her co-conspirators to perform acts in furtherance of the conspiracy.

However, the email still leaves open the question of what Ellingsen would do to further the conspiracy. On one hand, the "help" Ellingsen offered was to explain ETS's billing practices to

10

clients—as she had done with Jiles. These actions would not be evidence of illegal intent because she would be doing the opposite of concealment—providing disclosure. The other interpretation of "help" is to attempt to mislead clients in the future. Both inferences would be consistent with the language of the email. However, a reasonable jury could only infer the former and not the later, as explained below.

In order to prove Ellingsen joined the conspiracy, the Government was required to prove that she had knowledge of its illicit nature and that she joined with the intent to further the illicit goals. *See Ganji*, 880 F.3d at 767. While a reasonable jury could infer that she had knowledge based on the phone calls and the email, it could not do so for the intent requirement. This is because the reading favorable to the Government is ultimately unreasonable given the other circumstantial evidence. The Government has not provided any evidence after Ellingsen sent this email on January 31, 2019, that would show how she intended to further the illicit nature of the conspiracy. Nor is there any evidence that shows her agreement to "help" was intended to be different from how she explained the billing practices to customers in the past. Moreover, even a concert of action theory fails to show that she actually did act differently after this email. Thus, there is no reasonable inference a reasonable jury could draw in the Government's favor. Instead, the only inference a reasonable jury could draw is that Ellingsen agreed to help explain the billing procedures to customers.

Fifth Circuit precedent also supports an acquittal for Ellingsen. In *United States v. Ganji*, the Fifth Circuit reversed a conviction for conspiracy to commit healthcare fraud because the evidence did not establish that the defendant doctor entered into a conspiratorial agreement. 880 F.3d at 767–73. There, the Government based its argument for conviction on three pieces of

evidence: (1) that a different doctor associated with the defendant had an established fraudulent behavior as a medical director; (2) the defendant received a $1,000 monthly check; and (3) that the doctor saw an increase in patient referrals. *Id.* at 768. At trial, none of the doctors or nurses who testified about the fraudulent scheme testified that they agreed with the defendant to carry out their fraudulent activities. *Id.* at 770. Further, two of the doctors who testified to their own fraudulent activities stated that they did not even know the defendant. *Id.* Despite the defendant's similar actions to those who testified to their own fraud, no evidence showed that the defendant followed the same practice as the others. *Id.* Ultimately, the Fifth Circuit found that the Government's evidence was based solely on inferences to support a fraud charge and then attempted to use those same inferences to support that there was a larger agreement. *Id.* Ultimately, the Fifth Circuit found that the evidence established the defendant associated with the conspirators but that it failed to present evidence that would allow a reasonable juror to infer the existence of a conspiratorial agreement beyond a reasonable doubt. *Id.* at 773.

In *United States v. Anderson*, the Fifth Circuit reversed a district court's denial of acquittal because it found that that the evidence did not establish a defendant conspired to possess extortion proceeds. 932 F.3d 344, 352 (5th Cir. 2019). At trial, the Government proved that the defendant agreed to retrieve and possess what he thought were drug trafficking proceeds. *Id.* The Government sought to use this evidence to prove that the defendant was guilty of a conspiracy to possess extortion proceeds, because the statute stated that it only required the knowledge that the monies were unlawfully obtained, not that they resulted from extortion. *Id.* The Fifth Circuit found that the specific intent necessary for conviction required that the defendant know that the proceeds were from extortion. *Id.* Thus, it found a problem with the government's evidence because the

12

evidence only established the defendant knew the funds were from drug trafficking and there was no evidence suggesting the defendant knew any extortion occurred. *Id.* Ultimately, the evidence failed to support the necessary *mens rea* and the defendant's conviction was reversed. *Id.*

In *United States v. White*, the Fifth Circuit reversed the conviction of defendants who were convicted of a conspiracy to distribute heroin because it found that there was no evidence of an agreement between the defendants to sell heroin together. 569 F.2d 263, 266–68 (5th Cir. 1978). There, the trial evidence established that two defendants each sold heroin and that they were married to each other. *Id.* at 267. While some other circumstantial evidence existed, the Fifth Circuit found that the "bits and pieces of evidence add up to no more than ground for conjecture and suspicion that a conspiracy existed, not proof beyond a reasonable doubt." *Id.* The problem with the trial evidence was that it did not establish any connection between the husband and wife in their separate effort to deal heroin. *See id.* at 267–68. While both the husband and wife dealt heroin, no evidence suggested that they agreed to sell heroin *together* in a drug trafficking scheme. *Id.* At most the evidence established some similar conduct between people associated with each other, but did not show an agreement between those people. *See id.* at 268. Thus, the Fifth Circuit reversed the convictions. *Id.* at 268.

Moreover, in conspiracy cases involving employees, the Fifth Circuit requires that the evidence shows that the employee did or said something that clearly evinces an intent to join the conspiracy and further its illicit purpose. In *United States v. Judd*, the Fifth Circuit upheld a conviction of conspiracy to commit mail fraud against a salesperson who was not a manager where the evidence showed that a defendant: (1) told potential buyers that the company he worked for was securing mining permits and would begin mining soon; (2) told a co-worker that the statements

13

were false; (3) discussed with a co-worker that an investment report sent to potential buyers was fake; and (4) made other false statements to potential buyers. 889 F.2d 1410, 1415–16 (5th Cir. 1989). Likewise, in *United States v. Sneed*, the Fifth Circuit upheld a conspiracy to commit mail fraud when the defendants: (1) made false statements to customers; (2) misrepresented to victims that they would receive a specific prize; (3) misrepresented to victims the amount of money the needed to send in to win the prize; (4) that the receptionist told others working for her boss was wrong but continued to work for him; and (5) circumstantial evidence showing that the defendants gave conflicting stories about their business practices or involvement in the operation. 63 F.3d 381, 387 (5th Cir. 1995).

Here, the evidence offered by the Government would not allow a reasonable jury to conclude that Ellingsen was anything more than a remote worker who had scant interactions with the other Defendants at ETS. Ellingsen provided technical support for the BETs and explained ETS's billing practices when asked to do so. She did not make false statements like the defendants in *Judd* and *Sneed* did. *See id.; Judd*, 889 F.2d at 1415–16. Instead, Ellingsen disclosed ETS's billing practices, something the First Superseding Indictment alleges she failed to do (Dkt. #274 at ¶¶ 8–24). Additionally, the evidence adduced at trial would not allow a reasonable jury to infer that Ellingsen actually knew ETS had not disclosed it charged clients both the card brand fee and debit markup in the interchange before she spoke with Jiles on the phone. Further, after she learned that ETS had not disclosed its billing practices, a reasonable jury could not infer that she then joined the conspiracy because no evidence showed that she had the intent to conceal the billing practices from clients in future interactions.

14

In sum, the evidence the Government submitted is only circumstantial as to Ellingsen's involvement in the alleged scheme. The only way a reasonable jury could conclude that Ellingsen is guilty to *assume* she is guilty and twist the evidence to fit that conclusion. That is not how the law works. Ellingsen's presumption of innocence requires an evaluation of her conduct as an employee and requires the Government to show how she became a conspirator by evidence beyond a reasonable doubt. The Government failed to do so. When viewing the evidence objectively and drawing inferences in favor of the government, the evidence at most gives equal support to a theory of Ellingsen's innocence as it does to a theory of guilt. Such evidence does not prove Ellingsen's guilt beyond a reasonable doubt and her acquittal is required. *See United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir. 1992).

## CONCLUSION

It is therefore **ORDERED** that Defendant Gina Ellingsen's Motion for Judgment of Acquittal (Dkt. #374) (Dkt. #374) is hereby **GRANTED**.

**IT IS SO ORDERED.**

**SIGNED** this 15th day of April, 2025.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE